RECEIVED

MAY 1 5 2008

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

In The United States District Court
For The Western District of Pennsylvania

---

Civil Action No. 1:08- CV- 148

Aaron C. London # 37992-060, the Petitioner

V.

United States of America, the Respondant

---

A Motion For Relief Pursuant to Rule
60(B)(4) thru An Independant Action
of The District Court

Submitted By,
Pro Se Litigant
Aaron C. London

cc: International Court
U.N. Nations
Anonymous Art. II § 2 Probe

# Table Of Contents

Statement Of Jurisdiction . . . . . . . A

Table Of Authorities . . . . . . . . . B1-B5

Pro' Se Litigant . . . . . . . . . . C

Note To The Court . . . . . . . D

The Petitioners Lack of Statutory Jurisdiction
Claims . . . . . . . . . . . . . pgs. 1-12

Violation Of Due Process Claims . . . . . . . pgs. 13-22

The Conclusion . . . . . . . . . . . . pgs. 23-26

Supplemental Appendix . . . . . . . Supp. Appx 1-25

Certificate Of Service . . . . . . . . . . . E

## Statement Of Jurisdiction

The U.S. District Court has juris-
diction under Rule 60 (B)(4) of the Fed. Civ. Rules
of Proc. to vacate any judgement that is void.
Via an Independant Action Of the Court.

Also the Petitioners challange of an
invalid conviction is sufficient enough for Art.
III & 2 standing. Spencer V. Kemna, 140 L.Ed 2d
At 50 [26].

A

# Table Of Authorities

## Statement Of Jurisdiction

Fed. R. of Civ. Proc. Rule 60 (B)(4) ..... A
Art. II § 2 ..... A
Spencer v. Kemna, 140 L.Ed 2d at 50 [2B] .... A

## Pro Se Litigant

U.S. v. Garth, 188 F.3d At 108 (3d Cir.1999).... C
Haynes v. Kerner, 404 U.S.520-21 (1972) ..... C

## Note To The Court

Stutson v. U.S. (1996), 516 U.S. At 194-95.... D
18 § 241 And 242 ...... D
U.S. v. Lanier, 520 U.S. At 270 .... D

## The Petitioners Lack Of Jurisdiction Claims

Rule 60 (B)(4) ........ 2
Raymark Indus Inc. v. Lai 973 F.2d 1125,
1132 (3d Cir. 1992)............ 2
Marshall v. Bd. of Educ. 575 F.2d Id. At
422 (3d Cir. 1978) .......... 2
Betz v. F.D.I.C., 99 F.3d At 905 (9th Cir.
1996). ............... 3
12 USC § 1813 (c) ........ 3
18 U.S.C. § 2113 (f) ......... 3

B-1

# Table Of Authorities

Legal Research and Writing by William P.
Statsky (5th Edition) pg. 235-36 . . . . . 4

§101, Banking Act of 1935, ch. 614, 49
Stat. 684, 685-86 . . . . . . . . . . 4

F.D.I.C. v. Phila. Gear Corp, 476 U.S. at 437 . . . 4

See H.R. Rep. No. 1827, 86th Congress 2d.
Sess. 10 (1960)(same) . . , . . . . 5

U.S. v. Sanders, 165 F.3d at 251 (3rd
Cir. 1999) . . .  . . . . . . . . . 6

Necessary And Proper Clause . . . . . . 6

P. Supp. Appx. 4, 5, 6, 7 . . . ▬, ▬, 6, ▬

P. Supp. Appx. 8, 9, 10. . . . . , ▬▬▬ 6

12 U.S.C. 588(b), 588(c) and 588(d) . . . 6

18 § 3231 . . . . . . . . . . 6

History: Ancillary Laws and Directives
on 18 § 3231 . . . . . . . . . 6,7

P. Supp. Appx. 4, 5, 6, 7, 8, 9, 10 . . . . 7

Blacks Law Dictionary 6th Edition .
pg. 803 . . . . . . . . . . . . . 7

U.S. v. Lee, 359 F.3d 194, 209 (3d Cir.
2004) . . . . . . . . . . . 8

## Lack Of Art. III § 2 Jurisdiction

Art III § 2 . . . . . . . . . . . 8

# Table Of Authorities

Okereke v. U.S., 307 F.3d At 121 N.4
(3d Cir. 2002) . . . . . . . . . . 9

Lujan v. Def. of Wildlife, 504 U.S. 555,
560 . . . . . . . . . . . . . 9

P. Supp. Appx. 2 . . . . . . . . 9

O'Shea v. Littleton, 38 L.Ed 2d At
684 . . . . . . . . . . . 9, 10

P. Supp. Appx. 3, 12 And 13 . . . . . . 10

Atherton v. F.D.I.C., (1997) 136 L.Ed
2d At 668, 669 . . . . . . . . 10

Willing v. Chicago And Assoc. 277 U.S.
Id. At 288 . . . . . . . . . . 10

Onieda Indian Nat. of N.Y. v. County
of Onieda, 414 U.S. 661, 666 . . . . . 11

## Lack Of Statutory Jurisdiction under 18 §3231

18 § 3231 . . . . . . . . . . . . 11

P. Supp. Appx. 4 - 10 . . . . . . . . . 12

## Violation Of Due Process Claims

Rule 60 (B)(4) . . . . . . . . . 14

10th Amend. U.S. Const. . . . . . . 14

Constr. Drilling, Inc. v. Chusid, 131 Fed. Appx.
366, 372 (3d. Cir. 2005) . . . . . . . 14

# Table Of Authorities

18 § 2113 (f) . . . . . . . . 15

Due Process Clause . . . . . . . . 15

P. Supp. Appx. 4 - 10 . . . . . - 15

U.S. v. Lopez (1995) 514 U.S. at

584 . . . . . . . . 16

Kennedy v. Mendoza - Martinez, 9

L.Ed 2d 644 (1963) . . . . . .. 16

## Violation Of Due Process / Void Statute / Not Necessary And Proper

Desousa v. Reno, 190 F.3d at 184-85

(3d Cir. 1999) . . . . . . . 17

Ex Parte Siebold, 100 U.S. 371 (1879) . . . 17

Necessary And Proper Clause . . . . . 17

U.S. v. Tyler, 281 F.3d at 92 (3d. Cir.

2002) . . . . . . . . . . 17

P. Supp. Appx. 6, 9 and 10 . . . . .. 17

P. Supp. Appx. 3, 12 and 13 . . . . 18

U.S. v. Lopez, 514 U.S. Id. at 567 . . . 18

## Violation Of Due Process / In-sufficiency Of Evidence on Jurisdictional Element

P. Supp. Appx. 14-16 . . . . . . 19

U.S. v. McIntosh, 463 F.2d 250 (3d

B-4

# Table Of Authorities

Cir. 1972) . . . . . . . . . . . . . . 19

U.S. Gov't Exhibit # 7 . . . . . . . . 19

P. Supp. Appx. 17 And 18 . . . . . . 19

P. Supp. Appx. 12 . . . . . . . . 20

Websters New World, Pocket Dict. 4th
Edition (Wiley Publishing Inc. 2000) . . . . 20

Jackson v. Virginia, 443 U.S. 307,
319 (1979) . . . . . . . . . . 20

U.S. v. Syme . . . 276 F. 3d, Id. At
157 . . . . . . . . . . . . 20

Re Winship (1970), 397 U.S. At 363
[5], 364 And 371 . . . . . . . . 21, 22

## The Conclusion

Thomas Paine " Rights of MAN ", pg. 147
(Wordsworth Edition Limited 1996) . . . . . . 24

Walling v. Brown, 204 U.S. 320 . . . . . 24

Plant v. Spendthrift Farm, Inc. 514 U.S.
211 (1995) . . . . . . . . . . . 24

P. Supp. Appx. 19 — 22 . . . . . . . 25

Cohen v. Virginia, 6 Wheat (19 U.S.) 264,
404 (1821) . . . . . . . . . . . 25

Rule 60 (B)(4) . . . . . . . 26

18 § 3731 . . . . . . . . . 26

## Pro' Se' Litigant

Under 3rd Circuit precedent, a Pro' Se'
Petitioners pleadings should liberally con-
strued to do substantial justice. U.S. v. Garth,
188 F.3d at 108 (3rd Cir. 1999). Pro' Se Litigants
Allegations are held to less strigent standards
then formal pleadings drafted by lawyers. Haynes
v. Kerner, 404 U.S. 520-21 (1972), and no
matter how in-artfully pleaded - are sufficient
to call for the oppurtunity to offer supporting
evidence. Kerner, at 521.

C

# Note To The Court

Thru out the Petitioners motion he uses a lot of civil Rulings but civil Rulings have Applicability in criminal cases too, as well. See e.g. Stutson v. U.S. (1996), 516 U.S. at 194-95.

In fact the U.S. Supreme Ct. held in U.S. v. Lanier, when discussing the validity of 18 § 241 and 242, that fact that one has a civil and the other a criminal role is of no significance; [ both serve the same objective ] ... (the rest omitted) Lanier, 520 U.S. at 270. The same can be said of Art. III § 2 standing. Whether the federal courts are applying it to civil or fed. criminal jurisdiction. It serves the same objective. The U.S. District Courts jurisdiction.

D

# The Petitioners Lack Of Statutory Jurisdiction Claims

**Q:** What makes Rule 60 (B) (4) applicable the petitioners motion ?! Enabling the U.S. District Court to properly entertain the motion under prevailing 3rd Cir. and U.S. Supreme Ct. law ?!

**A:** When a judgement is void. It is " one which from its inception was a complete Nullity and without legal effect." Raymark Indus Inc. v. Lai , 973 F.2d 1125, 1132 (3rd Cir. 1992). Therefore a judgement that is void is subject to ~~obtain~~ relief under Rule 60 (B)(4). if the court that rendered it. [Lacked jurisdiction of the subject matter or the parties or entered a decree which is not granted to it by law.] Marshall v. Bd. of Education, 575 F.2d Id. at 422 (3d Cir. 1978).

Lack of Jurisdiction Pursuant to 18 § 2113 (f)

**Q:** Why should the District Court dismiss Mr. London's (3) count indictment under Rule 60(B)(4) for lack of statutory jurisdiction ?!

**A:** (1) The Petitioner recieved a letter from Northwest Savings Bank (the victim bank) Regional Operations Officer, Michael R. Carlin,

2

in which he states as follow:

DEAR MR. LUNDEN (sic),

This is in reply to your letter dated Nov. 6th, 2006. [There was no private insurer who insured the robbery of our office at 5624 Peach St. Erie, P.A. 16509 on Dec. 2nd, 2000.] (the rest omitted). SEE Petitioners Supplemental Appendix 2.

(2) The funds or an account in a bank, doesn't always have to be segregated in order to be deposits not recognizable under 12 USC § 1813 (L) (what defines deposits insured by F.D.I.C. coverage). See e.g. in Betz v. F.D.I.C., 99 F.3d at 905 (9th Cir. 1996). The deposits robbed from Northwest Savings Bank were not deposits recognizable under 12 U.S.C. § 1813 (L). Therefore the deposits were not insured by the F.D.I.C. as to give the U.S. District Court for Erie, P.A. statutory jurisdiction to try, convict and sentence the petitioner in U.S. v. London 01-01 (ERIE); pursuant to 18 § 2113 (f).

(3) The F.D.I.C. has the authority to write rules and regulations, An in doing so the agency is "making law" like a legislature.

3

Such laws being referred to as quasi-legislation.
See Legal Research and Writing by William P.
Statsky (5th Edition) pg. 235-36. Giving the agency
the authority to interpret the statutes and re-
gulations that govern it, an to resolve disputes
that arise over applications of such laws.
This is known as quasi-judicial power. Legal
Research, id. at 235-36.

      These powers granted to the F.D.I.C.
is supported by Congressional Acts and precedent-
ial law. The term "deposit" of deposit
insurance is defined by the board of directors
[of the F.D.I.C.] See § 101, Banking Act of
1935, ch. 614, 49 Stat. 684, 685-86. Those
current regulations remain still in force today,
See F.D.I.C. v. Phila. Gear. Corp. 476 U.S. at 437.
An when Congress fails to revise or repeal an
agency's interpretation, is persuasive enough
evidence that the interpretation is the one
intended by Congress, F.D.I.C. v. Phila, at 438.
In fact in the 1960 revisement of the Act.
The Congress specifically stated that, " The
amended definition (of 12 § USC 1813(1) defining
deposits insured) would include the present
statutory definition of deposits [and the
definitions of deposits in the rules and

REgulations of the F.D.I.C. SEE H.R. Rep. No.
1827, 86th CONGRESS, 2d. SESS. 10 (1960) (SAME)
An it WAS UNDER these CIRCUMSTANCES, that the
U.S. Supreme Ct. Ruled, "... that A obvious great
deal of deference has to BE given to the
F.D.I.C.'s intrepretation of what the REGulations
do or do Not include within their definition
of deposits." F.D.I.C. v. Phila, at 438.

          The deposits Robbed from North
West SAvings Bank in Erie, P.A. on Dec. 2nd, 2000.
WERE Not recognizable deposits under F.D.I.C.
insurance pursuant to 12 U.S.C. § 1813(L) § F.D.I.C. v.
at Phila, at 438. SEE also P. Supp. Appx. 3. Therefore
tha U.S. District Court lacked jurisdiction under 18
§ 2113 (f) to try the petitioner.

Q: Why has All past previous Rulings by
   U.S. Courts of Appeals And U.S. District Courts
   missed construe the Reading of the statute
   of 18 § 2113 (f), which reads "... deposits
   of which WERE then insured by the F.D.I.C.
   ..." ?!

A: The rule in ascertaing the meaning
   of A statutory provision. WE ARE not
   only instructed to look At the particular

5

statutory language but the design of the
statute as a whole and to its object and
policy." U.S. v. Sanders, 165 F.3d at 251
(3d Cir. 1999) (McLaughlin opinion). Its object
and policy is under the Necessary And Proper
Clause, " Almost the entirety of the fed.
criminal justice system is built upon the
Necessary and Proper Clause foundation." U.S.
v. Tyler, 281 F.3d at 93 n.9 (3d Cir. 2002).
          So 18 § 2113(f) as far as
mere robbery was Un-Necessary and Proper.
Fore the State of P.A. has policed the crime
of robbery before the U.S. Const. even existed.
See P.Supp. Appx. 4, 5, 6, 7, and has reserved
the right to solely and exclusively trey
criminals in its jurisdiction for the commission
of any crime of robbery. See P.Supp. Appx. 8,
9, 10. (P.A. Const. 1776). Which is why Congress
enacted in the former language of 12 U.S.C.
588d which related to bank robbery and read,
" Jurisdiction over any offense defined by
588 b and 588 c of this title shall not
be reserved exclusively to courts of the
U.S." which was only later on omitted as
to be more adequately covered by 18 § 3231.
See the History; Ancillary Laws and Directives

6

of 18 § 3231. 18 § 3231 reading in part [No-
thing in this title shall be held to take
away or impair the jurisdiction of the Several
States and the laws thereof.] See P.A.s (a
Several State) laws thereof. See P. Supp. Appx. 4,5,6,
7,8,9,10.

Futhermore if Congress wanted the
U.S. District Court to have jurisdiction over bank
robbery cases, that did not drive a bank
in to insolvency. Which the F.D.I.C. insurance
covers those deposits. Congress could have provided
criminal insurance coverage. Which is also
sponsored by the Fed. Gov't just like F.D.I.C.
coverage. Criminal insurance — Type of Insurance
which protects insured from losses due to crimi-
nal acts against insured such as burglary
etc. Such insurance is sponsored by the Fed.
Gov't for residents of certain high crime
localities. Blacks Law Dict. 6th Edition pg. 803
This means that Congress power endorsed in
18 § 2113 (f) was not to surpass the insolvency
or bankruptcy via criminal acts.
               So. A reasonable doubt persist
about a statutes intended scope even after
resort to " the legislature history, language
and structure and motivating policy of the

7

statute, " <u>Sanders</u> at 251. (McLaughlin opinion).
So the Rule of lenity must apply and the
statute is to be narrowly construed. <u>Id.</u>

It is the 3rd Circuit precedent
to read indictments in a common sense
manner. <u>U.S. v. Lee, 359 F.3d 194, 209
(3d Cir. 2004)</u>. Reading "... the deposits
of which were then insured by the F.D.I.C.
..." in a common sense manner, in
Reflection to the petitioners previous facts
of law and g congressional policy. presented
in the motion herein. It has clearly been
shown that the U.S. District Court in the
case of <u>U.S. v. London, 01-01 (Erie)</u> lacked
statutory jurisdiction under <u>18 § 2113(f)</u>.

<u>Lack Of Art. III & 2 Jurisdiction</u>
Q: Why did the U.S. District Court lack
   <u>Art. III & 2</u> jurisdiction, making the Pet-
   itioners judgement void pursuant to Rule
   <u>60(B)(4)</u>?!

A: In order for the U.S. District Court to
   exercise its jurisdiction it must be a
   case or controversy. An the plaintiff
   (the U.S. Gov't) must demonstrate that he

B

has suffered or is threatened with an actual
injury traceable to the petitioner. That can
be redressed by a favorable decision by the
district court. <u>Okereke v. U.S., 307 F. 3d at
121 n.4 (3d Cir. 2002).</u>

      The U.S. District Court lacked
standing to hear the case. Because the U.S.
Gov't hadn't or couldn't meet the [irreducible]
requirements. Which contains (3) prongs: (1)
injury in fact to the plaintiff (U.S. Gov't);
(2) causation of that injury by the Petit-
ioners complained of conduct; And (3) a
likelihood that the request relief will address
that injury. <u>Lujan v. Def. of Wildlife, 504 U.S.
555, 560.</u> The F.D.I.C. and the U.S. Gov't
failing on all three.

      To cover the first prong.
There was no injury in fact to the U.S.
Gov't or the F.D.I.C. The injury in fact
was done to Northwest Savings Bank. <u>See
P.Supp.Appx. 2.</u> Also a case or controversy
based on deterring a Petitioner from com
mitting a crime or a future crime is
in-sufficient to make out an <u>Art. III & 2.</u>
claim. Because it is an area of speculation
and conjecture. <u>See e.g.</u> <u>O'Shea v. Littleton,</u>

9

38 L.Ed 2d at 684. An the F.D.I.C. via F.O.I.A. has admitted the following to the petitioner: " The F.D.I.C. does not bring criminal charges against no one. And is therefore not a criminal law enforcement agency." "Futher [ federal prosecutors in bank robbery cases does not represent the F.D.I.C.]." " We would not normally have provided any testimony in a criminal proceeding. As we are not a party to such a proceeding." See P.Supp. Appx. 3, 12, 13. An when the F.D.I.C. is not acting in its role a in-surer for the fed gov't, there is no federal interest. See e.g. Atherton v. F.D.I.C., (1997) 136 L.Ed 2d at 668. " In sum, we can find no significant conflict with, or threat to, a federal interest." Atherton, at 669.

This proves that the (3) prongs applies to Northwest Savings Bank not the F.D.I.C. and the U.S. Gov't." This Court held that an Art. III case or controversy had not arisen because " [no] defendant had wronged the plaintiff or threatened to do so." Willing v. Chicago Aud. Assoc., 277 U.S. Id. at 288. The U.S. District

10

Court also lacks <u>Art. III § 2</u> jurisdiction when a claim is immaterial, wholly insubstantial and frivolous, [ or otherwise so devoid of merit as not to involve a federal controversy ] (think F.D.I.C. v. Atherton, supra), then the court miss dismiss the claims for lack of subject matter jurisdiction. <u>See e.g. Oneida Indian Nat. of N.Y. v. County of Oneida, 414 U.S. 661, 666.</u> Therefore these matters. The U.S. District Court lacked <u>Art. III § 2</u> jurisdiction, ~~nullifying~~ nullifying its sentencing and conviction of the petitioner void pursuant to <u>Rule 60 (B)(4).</u>

<u>Lack Of Statutory Jurisdiction under 18 § 3231</u>

Q: Why did the U.S. District Court lack statutory jurisdiction under <u>18 § 3231,</u> making the petitioners conviction and sentence void under <u>Rule 60 (B)(4)?!.</u>

A: <u>18 § 3231</u> which gives the U.S. District Court jurisdiction over criminal cases. Read as follows: Fed. courts shall have jurisdiction exclusively of the State courts, of all offenses against the laws

of the U.S. (but it also says) [ Nothing in this title shall be held to take away or impair the jurisdiction of the several States under the laws thereof. ] Therefore the U.S. District Courts proceedings over the petitioner impaired and took away the jurisdiction of the State of P.A. See P.Supp. Appx. 4,5,6,7, 8,9,10. Meaning the U.S. District Court lacked statutory jurisdiction over the petitioners case pursuant to 18 § 3231. Making his conviction and sentence void under Rule 60 (B)(4).

12

# Violations Of Due Process Claims

Q: What makes <u>Rule 60 (B)(4)</u> applicable to
the petitioners motion ?! Enabling the U.S.
District Court to properly entertain the
motion under prevailing and precedential
3rd Cir. and U.S. Supreme Ct. law as far
as the petitioners claims (usurpation of power,
insufficiency of evidence on insurance element
at trial and <u>10th Amend.</u> violation) all
such claims resulting in a Due Process
violation ?!

A: A judgement can be voided on (2) grounds.
(1) If the rendered court lacked subject matter
jurisdiction or (2) [if it acted in a manner
inconsistant with due process of law]. <u>Constr.</u>
<u>Drilling, Inc. v. Chusid</u>, 131 Fed.Appx. 366, 372 (3d
Cir. 2005) ; <u>Wendt v. Leonard</u>, 431 F.3d 410, 412
(4th Cir. 2005) ; <u>N.Y. Life Ins. Co. v. Brown</u>,
84 F.3d 137, 143 (5th Cir. 1996) ; and <u>Margoles</u>
<u>v. Johns</u>, 660 F.2d 291, 295 (7th Cir. 1981).

Q: Why was the U.S. District Courts jurisdiction under 18 § 3231 or 18 § 2113 (f) or any other authority the District Courts claims it could've proceeded under. A clear usurpation of its granted federal power in violation of the petitioners 10th Amend. rights and the Due Process Clause ?!

A: Because the State of P.A. has been policing the crime of Robbery before the U.S. Const. even existed. See P. Supp. Appx. 6 and 7. An when P.A. adopted its Constitution in 1776. Those same laws were Reformed or Amended, not abolished. P. Supp. Appx. 4,5,6, and 10. An in the same constitution the State of P.A. reserved the Right to police its own citizens or those that commit crimes in its state. P Supp. Appx. 8 and 9. All laws and rights reserved to the State of P.A., mentioned up above, made to be constantly kept in force ... An ought to never be violated on any pretense what so ever. P. Supp. Appx. 10.

Therefore the power to police Robbery or any crime for that matter in the State of P.A. by the Fed. Gov't was

Not delegated to the U.S. Gov't under the enactment of the U.S. Constitution in 1791. Leaving the petitioners conviction and sentence void under Rule 60 (B)(4) for violation of the Due Process Clause and clear usurpation of the federal powers granted to the District Court.

Because each State in the union is sovereign as to all the powers reserved. An it must necessarily be so — because the U.S, have no claim to authority but such as the states surrendered to them. U.S. v. Lopez (1995) 514 U.S. Id. at 584 quoting Chisholm v. ~~~~~~~ Georgia, 1 L.Ed 440 (1793) (Iredell, J.) An furthermore the Bill of Rights and the procedures that it gareentee's are not to be Abrogated because the guilty may escape prosecution or for any other expediant reason. Kennedy v. Mendoza-Martinez, 9 L.Ed 2d 644 (1963).

● <u>Violation Of Due Process / Void Statute / Not Necessary and Proper</u>

Q: What makes 18 § 2113 (f) a violation of Due Process and void as a statute ?!

16

Justifying <u>Rule 60 (B)(4)</u> Relief ?!

A: The Courts role is not in judging the wisdom or fairness of Congressional policys choice but rather constitutionality. <u>De Sousa V. Reno, 190 F.3d At 184-85 (3d Cir. 1999)</u>. An if a law is un-constitutional and void, [ then it affects the whole foundation of the proceeding ] and the trial court could not have Acquired jurisdiction of the ~~courts~~ causes. <u>Ex Parte Siebold, 100 U.S. 371 (1879)</u>.

Congressional authority to create criminal law is derived from the <u>Necessary and Proper Clause</u> of the U.S. Const. for effecting the objects of gov't. <u>U.S. v. Tyler, 281 F.3d At 92 (3d Cir. 2002)</u>. An the provisions of <u>18 § 2113(f)</u> when it comes to the State of P.A. is un-Nebessary and un-proper. Fore the State of P.A. has reserved the sole exclusive right to police its own citizens. for the crime of robbery. A right that is to never be violated. <u>P.Supp. Appx. 69, and 10</u>. A state jurisdiction that is exempt

17

from being taken away or impaired pursuant
to 18 § 3231 and the 10th Amend. of the
U.S. Const.

    Finally 18 § 2113 (f) is Un-
Necessary and Proper because the F.D.I.C.
has No object or interest over the deposits
that were Robbed from Northwest Savings
Bank on Dec. 2, 2000. P.Supp.Appx. 3, 12
And 13. An when the F.D.I.C. is not
Operating in its capacity or Role as an
insurer for the Fed. Gov't, then there
is no fed. interest at hand. Atherton v.
F.D.I.C., supra. Not to mention the U.S.
Supreme Ct. in U.S. v. Lopez, 514 U.S.
Id. at 567 Ruled," The Constitution we
said, [does not tolerate reasoning that would
convert Authority under the Commerce
Clause to a general police of the sort
Retained by the States.] Id. at 567.

    Therefore 18 § 2113 (f) as it
applies to the State of P.A. is un-constitutional
And void for lack of Neccessariness and
Properness because Congress has failed to
show any significant effect of what the
violation of 18 § 2113 (f) would have on
the objects of Fed. Gov't. Tyler, supra.

18

Violation Of Due Process / In-sufficiency of
Evidence on Jurisdictional Element

Q: Why does the in-sufficiency of evidence on
the jurisdictional element at trial violate
the Due Process Clause ?! Voiding the petitioners
conviction and sentence under Rule 60
(B)(4) ?!

A: At the Petitioners trial the Bank Manager
from Northwest Savings Bank, Lawerence
D. Neizmek, testified that the bank was
F.D.I.C. insured on the date of the
robbery. P.Supp. Appx. 14-16. Then the U.S.
Gov't submitted in to evidence a ante-
dated F.D.I.C. certificate in support of
the testimony. P.Supp. Appx. 15 and 16.
          In U.S. v. McIntosh, 463
F.2d 250 (3d Cir. 1972), the 3rd Circuit held
that un-contradicted testimony by a
Bank Manager is sufficient enough to estab-
lish the bank is F.D.I.C. insured. But ●
in this case, the bank managers testimony
was contradicted by U.S. Gov't Exhibit # 7.
Which was either a 11 or 61 years old at
the time of the petitioners trial. See Gov't
Exhibit # 7 and P.Supp. Appx. 17 and 18. Because

19

there only issued to banks upon their admission
to the F.D.I.C. (P. Supp. Appx. 12) and only as
a courtesy. (P. Supp. Appx. 12). A courtesy
meaning "polite behavior or act — free;
complimentary." Websters New World, Pocket
Dict. 4th Edition (Wiley Publishing Inc. 2000),
Not proof of insurance over a decade later.

       Under Jackson v. Virginia, 443
U.S. 307, 319 (1979). There is only sufficient
evidence to support a conviction if viewing
the evidence in a light most favorable to the
prosecution; any rational trier of fact
could have found the element beyond a rea-
sonable doubt.

       In U.S. v. Syme, "Leaser" the U.S.
Gov't [expert medical witness], testified that,
he recieved "the medical records for Graham
for the dates of service. Jan. 20th, 1994 and
Mar. 17th, 1994." An that these records proved
that "Grahams" (no pun intended) the 80 yr. old
patient - Aug. 3rd, 1994 ambulance trip was
un-necessary. U.S. v. Syme, 276 F.3d Id. at
157. More importantly though. Was that the
court would go on to rule that because
the U.S. gov't could not put forth any
evidence more current than the 4 month

20

period then the date at question.... No
Reasonable jury could find beyond a Reason
Able doubt that Grahams Aug. 3rd, 1994
Ambulance trip was Not medically necessary.
Id. At 157.

Comparison. In U.S. v. London
Case No. 01-01 (Erie). Neizmek (the U.S. gov't
sole witness as to the F.D.I.C. element) relied
on a record that was either 11 or 61 yrs.
old (See Gov't Exhibit #7 and P. Supp. Appx. 17
and 18), A certificate that is only a courtesy
upon the banks Admission in to the F.D.I.C.
(P.Supp. Appx 12), An this compared to the record
in U.S. v. Syme is extraordinary. Therefore
the evidence relied on by the jury was only
a preponderance and in-sufficient to con-
vict beyond a reasonable doubt. " A person
Accused of a crime ... would be at a
severe disadvantage, [a disadvantage amounting
to a lack of fundamental fairness], if
he could be adjudged guilty and imprisoned
for years on the same strength of the
same evidence as would suffice in a civil
case, Re Winship (1970), 397 U.S. 363 [5].
The reasonable doubt standard is indepensable,
for it " impresses on the trier of fact

the necessity of reading a subjective certitude of facts in issue, <u>Winship At 364</u>. While on the otherhand, preponderance of evidence ⬛ ⬛ standards, Simply requires the trier of fact " to believe that the existence of a fact is more probable than its non-existence before..." <u>Winship, At 371</u>. Which is exactly the case here. Theres no way that " a rational trier of fact " could come to a certitude of facts based off of a 11 or 61 yr. old courtesy certificate. At best with Neizmeks testimony being contradicted by the out dated F.D.I.C. certificate. The jurys conclusion could only be based off preponderance. Fore the evidence presented by the U.S. gov't only raised a probability that the bank was insured on the date of the robbery, Dec. 2, 2000. Therefore the petitioners conviction and sentence was in violation of the <u>Due Process Clause</u>, Calling for <u>Rule 60 (B)(4)</u> relief.

22

# THE CONCLUSION

## The Petitioner Conclusion To His Rule 60(B)(4) Motion

Q: Why must the U.S. District Court Now grant the petitioner Rule 60 (B) (4) Relief?! Releasing him immediately, from federal custody, regardless of the U.S. District Courts social and political windfall?!

A: "..... A Constitution is a thing antecedent to the Gov't, and always district there from." Thomas Paine "Rights of Man", pg. 147 (words worth Edition Limited 1996).

　　　　An it is the matter of the judiciary to determine whether the acts of the other two dept.s are in harmony with the fundamental law. Walling v. Brown, 204 U.S. 320. But nevertheless. The Court presumes that Congress expects its statutes [to be read in conformity with the Courts precedents.] Plant v. Spendthrift Farm, Inc. 514 U.S. 211 (1995).

　　　　The ethics of the Fed. Gov't has come in to question and under suspicion

24

As a whole. See P. Supp. Appx. 19. Including the ethics of the U.S. Judges. P. Supp. Appx. 20, 21 and 22.

To accept the prosecutions contentions would propell the District Court in to treason against the U.S. Const. "We [judges] have no more right to decline the exercise of jurisdiction which is given, [than to usurp that which is not given.] The one or the other would be treason to the Constitution. Cohen v. Virginia, 6 Wheat (19 U.S.) 264, 404 (1821).

An this blatant treason by the District Court via usurpation of jurisdiction is quite the cause for the Art. III § 2 probe by Anonymous F.B.I. agents and Dept. of Justice prosecutors and radical defense Attys. Nationwide. Further fueled by one Texan defense Atty. allegations of Title 18 never even being signed in to bill by the Senate or Congress.

In which the public and the media has taken note of the U.S. Gov't current distasteful governance, producing

25

Articles such as these, "Is our Faith
In Gov't Dying?", "Respect The Constitution",
And "Umpiring The Constitution". See P. Supp.
Appx. 23, 24 and 25.

      With that said. The petitioner
Now motions the U.S. District Court to vacate
the petitioners conviction, judgement and sentence.
Dismissing All (3) counts of the indictment,
Releasing the petitioner immediately from
federal custody. Fore the U.S. District Court
has entered a decree which is not within
the powers granted to it by law. Marshall v.
Bd. of Educ., supra. Making the petitioners
conviction, judgement and sentence void, one
which from its inception was a complete
nullity and without legal effect. Ragmark
Indus Inc. v. Lai, supra. Acting in a
manner inconsistent with due-process of
law. Constr. Drilling, Inc. v. Chusid, supra.
Warranting the petitioner relief under the
Fed. R. of Civ. Proc. Rule 60 (B)(4).

      Futhermore the petitioner motions
the District Court to deny the U.S. Gov't
A C.O.A. pursuant to 1883731.

With Justice
Un Mind,
Pro Se Litigant

26

# **N** **NORTHWEST** **SAVINGS BANK**

800 STATE STREET  -  P. O. BOX 3306  -  ERIE, PENNSYLVANIA 16508  -  (814) 461-6990
FAX: (814) 461-6966

November 20, 2006

Aaron Lunden #37992-060
Allenwood (USP)
P.O. Box 3000
White Deer, PA 17887

Dear Mr. Lunden:

This is in reply to your letter of November 6, 2006. There was no private insurer who insured the robbery of our Office at 5624 Peach St. Erie, PA 16509, on December 2, 2000. Restitution is owed directly to Northwest Savings Bank, 800 State St. Erie, PA 16501, attention: Michael R. Carlin.

Sincerely,

Michael R. Carlin
Region Operations Officer

CC: D. Engle

*P. Supp. Appx. 3*
2

address: Ms. Marie A. O'Rourke, Assistant Director, FOIA/Privacy Unit, Executive Office for United States Attorneys, Department of Justice, Room 7300, 600 E Street, N.W., Washington, D. C. 20530-0001.

FDIC insurance covers the deposits of a bank in the event of the insolvency and closure of the bank, only. FDIC insurance **does not** cover an institution for losses incurred as a result of theft or robbery **in any instance.** Such insurance from theft, robbery or embezzlement is obtained under a bond or through a private insurance carrier chosen by each bank, which carrier is not an entity of the federal government. Information on a bank's blanket bond coverage, or its private insurance carrier who provides coverage to the bank in the event of theft, robbery or embezzlement, are records of the bank, and not the FDIC. We enclose a pamphlet entitled "Insuring Your Deposit," which provides further additional information about the FDIC and its role in insuring bank deposits.

This completes the processing of your request. As noted earlier, you have made one previous request to the FDIC for insurance information on Northwest Savings Bank, and a portion of that request also sought a copy of the bank's FDIC insurance certificate - FDIC log # 05-0303. We responded to that request by letter dated May 20, 2005, and told you that we had expended the 2 free hours of search time to which you were entitled as an Individual requester under FOIA (see our FOIA regulation and fee schedule, which we enclose.) We also advised you that any future requests from you on the same subject matter would be subject to the assessment of fees, and should include your agreement to pay fees.

The FOIA does not require an agency to entertain requests for information twice, nor to process requests that do not comply with the FOIA's fee provisions. As a courtesy to you, this one time, I have processed your second request and have waived the associated fees. I will not respond to further requests from you seeking a copy of the FDIC insurance certificate for Northwest Savings Bank. Also, you may file a new FOIA request at any time, but you need to comply with the FDIC's published FOIA regulations, including those pertaining to fees.

Sincerely,

Fredrick L. Fisch
Supervisory Counsel
FOIA/Privacy Act Group

Enclosures

F-2

P. Supp. Appx. 4

**PHMC**

Pennsylvania
Historical & Museum
Commission

Bureau of Archives and History, State Archives Division
350 North St., Harrisburg, PA 17120-0090

June 15, 2007

Mr. Aaron C. London
Allenwood (USP)
P. O. Box 3000
White Deer, PA 17887

Dear Mr. London:

The statute covering robbery at the time when the Pennsylvania Province (a colony of Great Britain) ceased to function and the Constitution of 1776 was proclaimed (making Pennsylvania a state and commonwealth), was the act of May 31, 1718, which defined the crime as follows:

"That if any person or persons shall commit sodomy or buggery, or rape or robbery, which robbery is done by assaulting another on or near the highway, putting him in fear and taking from his person money or other goods, to any value whatsoever, he or they so offending, or committing any of the said crimes within this province, their counsellors, aiders, comforters and abettors, being convicted thereof as above said, shall suffer as felons, according to the tenor, direction, form and effect of the several statutes in such cases respectively made and provided in Great Britain, any act or law of this province to the contrary in anywise notwithstanding."

And a further section of the statute imposed the death penalty if the robber intentionally maimed or disabled the person robbed.

This law was carried forward, after the 1776 Constitution was proclaimed, by the act of March 8, 1780, which was a general affirmation of most of the laws in operation in Provincial Pennsylvania in 1767.

The first change in the law of robbery after the 1776 constitution came with the act of March 8, 1780. A printout (from the Legislative Reference Bureau's web site presentation of the *Statutes at Large*) of the pertinent section of that law is enclosed. As you can see, it removed "at or near the highway" from the definition of felonious robbery.

A book by historian G. S. Rowe tells us that the first formal state Oyer and Terminer court took place in Lancaster on April 7, 1778. The State Archives does not have full records of all criminal trials that may have occurred there (or, for that matter, any other criminal trials under state jurisdiction from the date of the constitution, September 28, 1776 to April 7, 1778). Record Group 33 (records of the Pennsylvania Supreme Court) has three volumes of dockets and appearances before the supreme court for the years spanning the period from the proclamation of the constitution to 1780. These are available for research. However, a brief review of the files in the several boxes in which these are contained revealed 1778 records only for Philadelphia, not for Lancaster. All the other dockets and appearances were no earlier than 1779. The records for Philadelphia cases in 1778 were entirely trials for treason, for aiding and assisting the enemy, or for other war related matters. One indictment included a burglary charge, but the incident involved cooperation with the British. These documents are available for research here at the State Archives.

Full text presentations of all Pennsylvania's constitutions can be viewed and copied from the web site of the Duquesne University Law School. The address there is http://www.paconstitution.duq.edu/PAC_CC_1873.html.

The address of the Philadelphia City Archives is 3101 Market Street, First Floor, and Philadelphia, PA 19104.

Sincerely,

*Louis Waddell*

Louis Waddell
Associate Historian


CC: JRS
    CB

P. Supp. Appx. 6

110          *The Statutes at Large of Pennsylvania.*          [1780

[Act of 8 march 1780]

## CHAPTER DCCCLXXXIX.

AN ACT FOR THE AMENDMENT OF THE LAW RELATIVE TO THE PUN-
ISHMENT OF TREASONS, ROBBERIES, MISPRISIONS OF TREASON AND
OTHER OFFENSES.

(Section I, P. L.) Whereas in and by the act of assembly, enti-
tled "An act for the advancement of justice and the more cer-
tain administration thereof," [1] made and passed the thirty-first
day of May, in the year of our Lord one thousand seven hun-
dred and eighteen, the punishment of death is inflicted in the
case of robbery upon such only as commit the same on or near
the highway, so that no adequate provision seems to have been
made for punishing the most atrocious robberies if the same
be committed elsewhere:

[Section I.] (Section II, P. L.) Be it therefore enacted and
it is hereby enacted by the Representatives of the Freemen of
the Commonwealth of Pennsylvania in General Assembly met,
and by the authority of the same, That from and after the
passing of this act, if any person or persons shall commit rob-
bery, which robbery is done by assaulting another, putting him
in fear and taking from his person money or other goods to
any value whatsoever, whether the same robbery be committed
on or near the highway or elsewhere in any place or places
whatsoever within this commonwealth, he or they so offending
his or their counsellors, aiders, comforters and abettors, being
thereof duly convicted or attainted, or being indicted and stand-
ing mute, or challenging peremptorily above the number of
twenty persons returned to serve of the jury, shall suffer as
felons without benefit of clergy, in like manner as by the laws
of this commonwealth is provided in the case of robbers on or
near the highway.

(Section III, P. L.) And whereas the forfeiture of goods and
chattels, in the case of manslaughter, is rarely exacted, and

[1] Chapter 236.

P. Supp. Appx. 7



Pennsylvania
Historical & Museum
Commission

Bureau of Archives and History, State Archives Division
350 North St., Harrisburg, PA 17120-0090

January 18, 2007

Mr. Aaron London #37992-060
Allenwood (USP)
P. O. Box 3000
White Deer, PA 17887

Dear Mr. London:

Your unsigned letter of January 15, 2007, to the Pennsylvania State Archives was referred by Mr. Jonathan Stayer, Chief of the Reference Section, to my desk for response. I am an associate historian on the staff of the Section.

The first Pennsylvania enactment to bear the title "constitution" was the Constitution of 1776, which came into being when a constitutional convention completed it on September 28, 1776, although the machinery of government it established is usually dated from the beginning of its first General Assembly, in early 1777. There was no approval process involving the Pennsylvania voting population. The State Archives has one of the manuscript copies of the Constitution, and it can be seen online at our Web site link: http://www.docheritage.state.pa.us/documents/constitutiontrans.asp. As I am not certain the internet is available to you, I enclose a photocopy of a printed version from the reliable *Federal and State Consitutions, Colonial Charters, and other Organic Laws* . . . (1905).

Considering the dictionary definition of "constitution," one might say there were several pre-1776 Pennsylvania enactments that were constitutions, but these did not include the word "constitution" in their titles. The best known of these was the charter from King Charles II of 1681, but there were others including the Charter of Liberties of 1701. Only with the 1776 Constitution do we get a comprehensive Bill of Rights.

Pennsylvania has never had a "bank robbery" statute. Bank robberies have only been distinguished from other types of robbery with the passage of a federal statute in 1934. On the Villanova Law School Web site I found the text of a US Supreme Court case entitled *USA v. Anthony Cornish* (1996) in which the Court's opinion goes into the relationship between Pennsylvania's general robbery statutes and the federal bank robbery statute. http://VLS.law.vill.edu .

The earliest enactment of a statute covering robbery I would say was the Duke of York's Laws. These were created for all the colonial lands the Duke governed in North America in 1664, but were not made applicable to the Delaware valley until 1676. In other words, they became the law when England took control, in 1676, of part of the area that received, in 1681, the name Pennsylvania. I enclose a photocopy of page 80 of Gail McKnight Beckman Esq.'s *The Statutes at Large of Pennsylvania* . . . Volume I (Vantage Press, 1976), which includes the text of the robbery provisions. The version more familiar in Pennsylvania, the 1879 *Charter to William Penn and Laws of the Province of Pennsylvania, Passed between the Years 1682 and 1700, Preceded by the Duke of York's Laws in Force from the Year 1676 to the Year 1682,* constructed by John Blair Linn, is not available in our library, but it is my understanding that Attorney Beckman constructed the version in her book from a manuscript copy approved by the Duke of York himself and now on file at the British Public Record Office. The Duke of York's laws are not among the public records of the Pennsylvania State Archives.

The cost of these photocopies has been waived. The Law/Government Publications Reading Room of the Bureau of State Library, Pennsylvania Department of Education, may have better resources to answer inquiries you may have in the future.

Printable Constitution of Pennsylvania - 1776 transcription
Case 1:01-cr-00001-SJM  Document 79  Filed 05/15/2008  Page 43 of 59  Page 1 of 10
P. Supp. Appx. B.

## The Pennsylvania State Archives

## Doc Heritage Transcripts

## Constitution of Pennsylvania - 1776

WHEREAS all government ought to be instituted and supported for
the security and protection of the community as such, and to enable the individuals who compose it to
enjoy their natural rights, and the other blessings which the Author of existence has bestowed upon man;
and whenever these great ends of government are not obtained, the people have a right, by common
consent to change it, and take such measures as to them may appear necessary to promote their safety
and happiness. AND WHEREAS the inhabitants of this commonwealth have in consideration of
protection only, heretofore acknowledged allegiance to the king of Great Britain ; and the said king has
not only withdrawn that protection, but commenced, and still continues to carry on, with unabated
vengeance, a most cruel and unjust war against them, employing therein, not only the troops of Great
Britain, but foreign mercenaries, savages and slaves, for the avowed purpose of reducing them to a total
and abject submission to the despotic domination of the British parliament, with many other acts of
tyranny, (more fully set forth in the declaration of Congress) whereby all allegiance and fealty to the
said king and his successors, are dissolved and at an end, and all power and authority derived from him
ceased in these colonies. AND WHEREAS it is absolutely necessary for the welfare and safety of the
inhabitants of said colonies, that they be henceforth free and independent States, and that just,
permanent, and proper forms of government exist in every part of them, derived from and founded on
the authority of the people only, agreeable to the directions of the honourable American Congress. We,
the representatives of the freemen of Pennsylvania, in general convention met, for the express purpose
of framing such a government, confessing the goodness of the great Governor of the universe (who
alone knows to what degree of earthly happiness mankind may attain, by perfecting the arts of
government) in permitting the people of this State, by common consent, and without violence,
deliberately to form for themselves such just rules as they shall think best, for governing their future
society; and being fully convinced, that it is our indispensable duty to establish such original principles
of government, as will best promote the general happiness of the people of this State, and their posterity,
and provide for future improvements, without partiality for, or prejudice against any particular class,
sect, or denomination of men whatever, do, by virtue of the authority vested in us by our constituents,
ordain, declare, and establish, the following Declaration of Rights and Frame of Government, to be the
CONSTITUTION of this commonwealth, and to remain in force therein for ever, unaltered, except in
such articles as shall hereafter on experience be found to require improvement, and which shall by the
same authority of the people, fairly delegated as this frame of government directs, be amended or
improved for the more effectual obtaining and securing the great end and design of all government,
herein before mentioned.

### A DECLARATION OF THE RIGHTS OF THE INHABITANTS OF THE COMMONWEALTH, OR STATE OF PENNSYLVANIA

I. That all men are born equally free and independent, and have certain natural, inherent and inalienable
rights, amongst which are, the enjoying and defending life and liberty, acquiring, possessing and
protecting property, and pursuing and obtaining happiness and safety.

II. That all men have a natural and unalienable right to worship Almighty God according to the dictates
of their own consciences and understanding: And that no man ought or of right can be compelled to
attend any religious worship, or erect or support any place of worship, or maintain any ministry,
contrary to, or against, his own free will and consent: Nor can any man, who acknowledges the being of

a God, be justly deprived or abridged of any civil right as a citizen, on account of his religious sentiments or peculiar mode of religious worship : And that no authority can or ought to be vested in, or assumed by any power whatever, that shall in any case interfere with, or in any manner controul, the right of conscience in the free exercise of religious worship.

III. That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same.

IV. That all power being originally inherent in, and consequently derived from, the people; therefore all officers of government, whether legislative or executive, are their trustees' and servants, and at all times accountable to them.

V. That government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or sett of men, who are a part only of that community ; And that the community hath an indubitable, unalienable and, indefeasible right to reform, alter, or abolish government in such manner as shall be by that community judged most conducive to the public weal.

VI. That those who are employed in the legislative and executive business of the State, may be restrained from oppression, the people have a right, at such periods as they may think proper, to reduce their public officers to a private station, and supply the vacancies by certain and regular elections.

VII. That all elections ought to be free; and that. all free men having a sufficient evident, common interest with, and attachment to the community, have a right to elect officers, or to be elected into one.

VIII. That every member of society hath a right to be protected in the enjoyment of life, liberty and property, and therefore is bound to contribute his proportion towards the expense of that protection, and yield his personal service when necessary, or an equivalent thereto: But no part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives: Nor can any man who is conscientiously scrupulous of bearing arms, be justly compelled thereto, if he will pay such equivalent, nor are the people bound by any laws, but such as they have in like manner assented to, for their common good.

IX. That in all prosecutions for criminal offences, a man hath a right to be heard by himself and his council, to demand the cause and nature of his accusation, to be confronted with the witnesses, to call for evidence in his favour, and a speedy public trial, by an impartial jury-of the country, without the unanimous consent of which jury he cannot be found guilty ; nor can he be compelled to give evidence against himself ; nor can any man be justly deprived of his liberty except by the laws of the land, or the judgment of his peers.

X. That the people have a right to hold themselves, their houses, papers, and possessions free from search and seizure, and therefore warrants without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his or their property, not particularly described, are contrary to that right, and ought not to be granted.

XI. That in controversies respecting property, and in suits between man and man, the parties have a right to trial by jury, which ought to be held sacred.

XII: That the people have a right to freedom of speech, and of writing, and publishing their sentiments;

I _____ do swear (or affirm) that I will be true and faithful to the commonwealth of Pennsylvania.: And that I will not directly or indirectly do any act or thing prejudicial or injurious to the constitution or government thereof, as established by the convention,.

## THE OATH OR AFFIRMATION OF OFFICE

I _____ do swear (or affirm) that I will faithfully execute the office of _____ for the _____ of ____ and will do equal right and justice to all men, to the best of my judgment and abilities, according to law.

SECT. 41. No public tax, custom or contribution shall be imposed upon, or paid by the people of this state, except by a law for that purpose: And before any law be made for raising it, the purpose for which any tax is to be raised ought to appear clearly to the legislature to be of more service to the community than the money would be, if not collected; which being well observed, taxes can never be burthens.

SECT. 42. Every foreigner of good character who comes to settle in this state, having first taken an oath or affirmation of allegiance to the same, may purchase, or by other just means acquire, hold, and transfer land or other real estate; and after one year's residence, shall be deemed a free denizen thereof, and entitled to all the rights of a natural born subject of this state, except that he shall not be capable of being elected a representative until after two years residence.

SECT. 43. The inhabitants of this state shall have liberty to fowl and hunt in seasonable times on the lands they hold, and on all other lands therein not inclosed ; and in like manner to fish in all boatable waters, and others not private property.

SECT. 44. A school or schools shall be established in each county by the legislature, for the convenient instruction of youth, with such salaries to the masters paid by the public, as may enable them to instruct youth at low prices: And all useful learning shall be duly encouraged and promoted in one or more universities.

SECT. 45. Laws for the encouragement of virtue, and prevention of vice and immorality, shall be made and constantly kept in force, and provision shall be made for their due execution : And all religious societies or bodies of men heretofore united or incorporated for the advancement of religion or learning, or for other pious and charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities and estates which they were accustomed to enjoy, or could of right have enjoyed, under the laws and former constitution of this state.

SECT. 46. The declaration of rights is hereby declared to be a part of the constitution of this commonwealth, and ought never to be violated on any pretence whatever.

SECT. 47. In order that the freedom of the commonwealth may be preserved inviolate forever, there shall be chosen by ballot by the freemen in each city and county respectively, on the second- Tuesday in October, in the year one thousand seven hundred and eighty-three, and on the second Tuesday in October, in every seventh year thereafter, two persons in each city and county of this state, to be called the COUNCIL OF CENSORS; who shall meet together on the second Monday in November next ensuing their election ; the majority of whom shall be a quorum in every case, except as to calling a convention, in which two-thirds of the whole number elected shall agree: And whose duty it shall be to enquire whether the constitution has been preserved inviolate in every part; and whether the legislative and executive branches of government have performed their duty as guardians of the people, or assumed to themselves, or exercised other or greater powers than they are intitled to by the constitution: They are also to enquire whether the public taxes have been justly laid and collected in all parts of this

P. Supp. Appx.



**Federal Deposit Insurance Corporation**
550 17th St. NW Washington DC, 20429                                    Legal Division

Mr. Aaron London
Reg. #37992-060
P.O. Box 3000 (SHU)                                        **MAY 0 2 2006**
White Deer, PA  17887

### FDIC Log # 06-0224

Dear Mr. London:

This will respond to your undated letter, received by our office on April 24, 2006, pursuant to the
provisions of the Freedom of Information Act ("FOIA," 5 U.S.C. § 552). In your letter, you ask
for 10 copies of FDIC certificate #28178 and/or copies of any FDIC certificate given to
Northwest Savings Bank, Millcreek Square, Peach Street, Erie, Pennsylvania. You also state that
no fee should be charged to you for the copies under Rule 16.11 (k)(1)(i)(ii). This marks your
second request to the FDIC for information regarding Northwest Savings Bank, and specifically
for a copy of the bank's FDIC certificate. Your previous request was logged in as FOIA 05-0303,
and was answered by our letter dated May 20, 2005.

The provisions of Rule 16.11 (k)(1)(i)(ii) do not pertain to the processing of your request under
the FOIA. Under the provisions of the FOIA, as an individual requester, you will receive 2 free
hours of search time, and up to 100 free pages. Fees are not an issue in this case, however, as no
billable fees have been incurred in the processing of this request.

The FDIC is an independent agency of the U.S. Government. It was established by Congress in
1933 to insure bank deposits, help maintain sound conditions in our banking system, and protect
the nation's money supply in case of financial institution failure.  See 12 U.S.C. § 1811 et seq.,
as amended.

Our records show that FDIC certificate #28178, Northwest Savings Bank, headquartered in
Warren, Pennsylvania, became FDIC-insured on January 26, 1939, and remains insured to the
present date. The branch of the bank that you are interested in, at Millcreek Square, Peach Street,
Erie, Pennsylvania, is an open and operating, FDIC-insured branch of the main office in Warren,
and has been open since June 30, 1989. Please see the enclosed print outs which show this
information.

The FDIC issues certificates of insurance to banks upon their admission to the FDIC. They are
issued as a courtesy only. These certificates are not required to be issued by law or regulation,
and copies are not kept. Duplicate certificates are only made by the FDIC upon request by the
institution or federal law enforcement authorities.

The FDIC does not bring criminal charges against anyone and is, therefore, not a criminal law
enforcement agency. Further, federal prosecutors in bank robbery cases do not represent the
FDIC. You should consult the Department of Justice with regard to any interest you have in
records concerning criminal matters, such as those covered under the jurisdiction of the Federal
Rules of Criminal Procedure. You may write to the Department of Justice at the following

F-1

Finally, the FDIC is not a criminal law enforcement agency and we do not file criminal complaints against individuals. We would not normally have provided any testimony in a criminal proceeding, as we are not a party to such a proceeding. If you have any questions concerning the jurisdiction of the Federal courts regarding your incarceration, you may wish to refer such issues to your attorney or the Federal Public Defender.

You may choose to submit a new FOIA request to the FDIC at any time. It must comply with our FOIA regulations and fee schedule (containing an agreement to pay), however, and you should not request records or information that has been previously requested and addressed. Remember, too, that the FOIA is not a forum to answer your questions, and that its purpose is to provide the public with agency records that shed light on government operations. It is not a replacement for civil or criminal discovery, nor is it intended as a substitute for post-conviction relief motions. As I have suggested to you, above, if you have questions concerning the jurisdiction of the Federal courts regarding your incarceration, you should refer such issues to your attorney or the Federal Public Defender.

This completes the processing of your request, as submitted. Thank you for your interest in the FDIC.

Sincerely,

Fredrick L. Fisch
Supervisory Counsel
FOIA/Privacy Act Group

Enclosure

F-3

P. Supp. App. ● 14

172

1   A.    Yes.

2   Q.    Had he given you the pager number so that if you recall

3   any details or had any concerns, you could contact him and talk

4   with him about this?

5   A.    Yes, because the day we did talk, I was very nervous.

6   Q.    But you're the one who called him, he didn't call you?

7   A.    Right.

8           MR. PICCININI:  That's all I have, your Honor.

9           THE COURT:  Thank you, Ms. Renzi, you're excused.

10  Call your next witness.

11          MR. PICCININI:  Your Honor, at this time I would

12  call Larry Neizmik.

13          MR. PATTON:  Your Honor, I would move to admit

14  Defendant's Exhibit I, which was Northwest bank security

15  procedures that Ms. Renzi identified.

16          THE COURT:  It's admitted.

17          MR. PICCININI:  Sir, please come up here and be

18  sworn.

19          THE CLERK:  Please raise your right hand.

20  Sir, would you state your name fully and spell it for the

21  record?

22          THE WITNESS:  Lawrence D. Neizmik.  L-a-w-r-e-n-c-e,

23  D., N-e-i-z-m-i-k.

24          LAWRENCE NEIZMIK, GOVERNMENT WITNESS, SWORN

25                  DIRECT EXAMINATION

APPENDIX 408

P-1

P. Supp, Appx. 15                                        173

1   BY MR. PICCININI:

2   Q.    Sir, please state your name for the jurors?

3   A.    Lawrence D. Neizmik.

4   Q.    Sir, if I can ask you at the outset to just move closer

5   to the microphone, sometimes the system cuts off.  Keep your

6   voice up as much as possible so the furthest juror would be

7   able to hear you, thank you.  Mr. Neizmik, how are you

8   employed?

9   A.    My position is Millcreek District Manager for Northwest

10  Savings Bank.

11  Q.    I'm going to draw your attention to December 2nd of the

12  year 2000, a bank robbery had occurred at the Northwest Savings

13  Bank on Peach Street near the Millcreek Plaza, near the

14  Millcreek Mall; do you recall that particular date?

15  A.    Yes, I do.

16  Q.    First of all, with regard to the funds at the Northwest

17  Savings Bank.  In general, which would cover the Northwest

18  Savings Bank that was robbed on this particular date, can you

19  indicate to the jurors whether or not Northwest Savings Bank,

20  whether those deposits at that bank are insured by the Federal

21  Deposit Insurance Corporation?

22  A.    Yes, they are.

23  Q.    I'm going to show you what I have marked Government

24  Exhibit 7 for identification, can you identify Government

25  Exhibit 7?

APPENDIX 409

P-2

P. Suppx Appx. ● 16

174

1    A.    Yes, that's a copy of our certificate, I have the

2    original here.

3    Q.    That is a photocopy of the original certificate

4    certifying that the funds at Northwest Savings Bank are insured

5    by the Federal Deposit Insurance Corporation?

6    A.    That's correct.

7    Q.    On December 2nd of 2000, were the funds so insured?

8    A.    Yes, they were.

9            MR. PICCININI:  Your Honor, I would request the

10   admission into evidence of Government Exhibit 7.

11            THE COURT:  Admitted.

12   BY MR. PICCININI:

13   Q.    In addition, Mr. Neizmik, were you involved in conducting

14   an audit of the Northwest Savings Bank at this particular

15   branch in order to determine how much money was stolen from the

16   bank as a result of the bank robbery?

17   A.    Yes, I did.

18   Q.    And in the course of that audit, did you discover that

19   $6,736.82 came up missing as a result of the bank robbery?

20   A.    That's the correct figure.

21   Q.    Finally, with regard to the camera system at the bank,

22   first of all, is that Northwest Savings Bank, is it equipped

23   with a camera system?

24   A.    Yes, it is.

25   Q.    On this particular date did the camera system function

APPENDIX 410

Back to Search Bank Find

## Your Bank at a Glance

**Northwest Savings Bank** (FDIC Cert: 28178)
is a FDIC Savings Bank and has been FDIC insured since **January 26, 1939.**
It was established on **January 1, 1896.**
Its main office (headquarters) is located at: .
> **Second At Liberty**
> **Warren, Pennsylvania 16365**
> **County of Warren**

**Northwest Savings Bank** has **155** Domestic Branches (Offices) located in **5** state(s.) (Check to locate Branches (Offices) by state.)

Northwest Savings Bank's website. http://www.northwestsavingsbank.com:80/
   Last financial information available about Northwest Savings Bank.
   Historical profile of Northwest Savings Bank
   The primary regulator is **Federal Deposit Insurance Corporation.**

   For additional information please click on one of the following:
   1. View the industry's overall picture - Statistics at a Glance
      (This will open a new window.)
   2. Current Financial data about your bank - Institution Directory – Two years Financial Report
      (This will open a new window.)
   3. Examine your bank's financial data - CALL/TFR Financial Information
   4. Study branching and deposit market share - Summary of Deposits/Market Share
   5. Analyze and compare individual institutions and create custom reports - Institution Directory – Compare
   6. Review industry using 8 predefined reports - Statistics on Depository Institutions
   7. Identify the latest performance trends in your state - Quarterly Banking Profile State Tables
      (This will open a new window.)
   8. Analyze institutions and custom peer groups - Statistics on Depository Institutions
   9. View branch office deposit information - Summary of Deposits
   10. Community Reinvestment Act (CRA) Performance Ratings - CRA Performance Ratings
   11. FDIC's Disclaimer - FDIC's Disclaimer
       For more information on Federal Deposit Insurance, check out Your Insured Deposits and Insured
       or Not Insured.

Questions, Suggestions & Requests

**Home   Contact Us   Search   Help   SiteMap   Forms**
Freedom of Information Act   Website Policies   FirstGov.gov

| Address | City | ZIP | Col | Date |
|---|---|---|---|---|
| Johnsonburg Plaza, Route 219 | Johnsonburg | 15845 | 11 | 10/8/1987 |
| 553 Market Street | Johnsonburg | 15845 | 11 | 2/29/1996 |
| 121 Main Street | Ridgway | 15853 | 23 | 10/15/2002 |
| Main At Mill Streets | Ridgway | 15853 | 11 | 1/1/1891 |
| 39 South St. Marys Street | Saint Marys | 15857 | 11 | 1/1/1896 |
| Million Dollar Highway | St. Marys | 15857 | 11 | 6/30/1986 |
| State Route 555 | Weedville | 15868 | 11 | 6/20/1966 |
| **Total for Elk County:** | **7 Office(s)** | | | |
| **Erie County** | | | | |
| 150 North Center Street | Corry | 16407 | 11 | 1/1/1924 |
| 108 Washington Towne Blvd. | Edinboro | 16412 | 11 | 8/22/2001 |
| 800 State Street | Erie | 16501 | 11 | 11/1/2000 |
| Grandview Plaza | Erie | 16504 | 11 | 1/1/1896 |
| 1408 Grandview Blvd. | Erie | 16504 | 23 | 3/5/2001 |
| 8th And Nevada St | Erie | 16505 | 11 | 1/1/1896 |
| 401 State Street | Erie | 16507 | 11 | 4/22/1987 |
| 3407 Liberty Street | Erie | 16508 | 11 | 12/11/2003 |
| 121 West 26th Street | Erie | 16508 | 11 | 1/1/1888 |
| 1945 Douglas Parkway | Erie | 16509 | 11 | 1/31/1994 |
| Mill Creek Mall | Erie | 16509 | 11 | 1/1/1896 |
| K-Mart Plaza West | Erie | 16509 | 11 | 1/1/1896 |
| 4525 Buffalo Road | Erie | 16510 | 11 | 1/1/1896 |
| Millcreek Square, Peach St | Erie | 16565 | 11 | 6/30/1989 |
| 7512 West Ridge Street | Fairview | 16415 | 11 | 1/8/2004 |
| 4452 East Lake Road | Harborcreek Township | 16511 | 11 | 6/30/1986 |
| 2102 Rice Ave | Lake City | 16423 | 11 | 6/30/1986 |
| 35 East Main Street | North East | 16428 | 11 | 5/19/1986 |
| 4 Perry Street | Union City | 16438 | 11 | 6/1/1967 |
| 22 North Main Street | Union City | 16438 | 11 | 2/2/1959 |
| 14457 South Main Street | Wattsburg | 16442 | 11 | 7/1/1955 |
| **Total for Erie County:** | **21 Office(s)** | | | |
| **Forest County** | | | | |
| Walnut And Spruce Streets | Marienville | 16239 | 11 | 1/1/1901 |
| 221 Elm Street | Tionesta | 16353 | 11 | 7/2/1947 |
| **Total for Forest County:** | **2 Office(s)** | | | |
| **Huntingdon County** | | | | |
| Ridge Road And Pennsylvania Avenue | Huntingdon | 16652 | 11 | 10/4/1971 |
| **Total for Huntingdon County:** | **1 Office(s)** | | | |
| **Jefferson County** | | | | |
| 2 East Main Street | Sykesville | 15865 | 11 | 6/1/1953 |
| **Total for Jefferson County:** | **1 Office(s)** | | | |
| **Lancaster County** | | | | |
| 350 Locust Street | Columbia | 17512 | 11 | 1/1/1902 |
| 2296 South Market Street | Elizabethtown | 17022 | 11 | 5/20/1999 |
| 1195 Manheim Pike | Lancaster | 17601 | 11 | 6/24/1999 |
| 922 Columbia Avenue | Lancaster | 17603 | 11 | 6/24/1999 |



P. Supp. Appx. 20

(202) 502-1100

# CODE OF CONDUCT FOR UNITED STATES JUDGES[3]

## CANON 1

### A JUDGE SHOULD UPHOLD THE INTEGRITY AND INDEPENDENCE OF THE JUDICIARY

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate establishing, maintaining, and enforcing high standards of conduct, and should personally observe those standards, that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

### COMMENTARY

Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges. The integrity and independence of judges depend in turn upon their acting without fear or favor. Although judges should be independent, they should comply with the law, as well as the provisions of this Code. Public confidence in the impartiality of the judiciary is maintained by the adherence of each judge to this responsibility. Conversely, violation of this Code diminishes public confidence in the judiciary and thereby does injury to the system of government under law.

The Canons are rules of reason. They should be applied consistent with constitutional requirements, statutes, other court rules and decisional law, and in the context of all relevant circumstances. The Code is to be construed so as not to impinge on the essential independence of judges in making judicial decisions.

The Code is designed to provide guidance to judges and nominees for judicial office. The Code may also provide standards of conduct for application in proceedings under the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 (28 U.S.C. §§ 332(d)(1), 372(c)), although it is not intended that disciplinary action would be appropriate for every violation of its provisions. Whether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable application of the text and should depend on such factors as the seriousness of the violation, the intent of the judge, whether there is a pattern of improper activity, and the effect of the improper activity on others or on the judicial system. Many of the proscriptions in the Code are necessarily cast in general terms, and it is not suggested that disciplinary action is appropriate where reasonable judges might be uncertain as to whether or not the conduct is proscribed. Furthermore, the Code is not designed or intended as a basis for civil liability or criminal prosecution. Finally, the purpose of the Code would be subverted if the Code were invoked by lawyers for mere tactical advantage in a proceeding.

## CANON 2

### A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEARANCE

P. Supp. Appx. 21

## OF IMPROPRIETY IN ALL ACTIVITIES

A. A judge should respect and comply with the law and should act at all times in a manner that promotes ƥ confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow family, social, or other relationships to influence judicial conduct or judgment judge should not lend the prestige of the judicial office to advance the private interests of others; nor convey or pɛ others to convey the impression that they are in a special position to influence the judge. A judge should not testif voluntarily as a character witness.

C. A judge should not hold membership in any organization that practices invidious discrimination on the bɛ of race, sex, religion, or national origin.

### COMMENTARY

**Canon 2A.** Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly. The prohibition against behaving with impropriety or the appearance oʆ impropriety applies to both the professional and personal conduct of a judge. Because it is not practicable to list all prohibited acts, the proscription is necessarily cast in general terms that extend to conduct by judges that is harmful although not specifically mentioned in the Code. Actual improprieties under this standard include violations of law, court rules or other specific provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds, with knowledge of all the relevant circumstances that a reasonable inquiry would disclose, a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired.

**Canon 2B.** The testimony of a judge as a character witness injects the prestige of the judicial office into the proceeding in which the judge testifies and may be misunderstood to be an official testimonial. This Canon, however, does not afford the judge a privilege against testifying in response to an official summons. Except in unusual circumstances where the demands of justice require, a judge should discourage a party from requiring the judge to testify as a character witness.

A judge should avoid lending the prestige of judicial office for the advancement of the private interests of the judge or others. For example, a judge should not use the judge's judicial position to gain advantage in litigation involving a friend or a member of the judge's family. In contracts for publication of a judge's writings, a judge should retain control over the advertising to avoid exploitation of the judge's office.

A judge should be sensitive to possible abuse of the prestige of office. A judge should not initiate the communication of information to a sentencing judge or a probation or corrections officer but may provide to such persons information in response to a formal request. Judges may participate in the process of judicial selection by cooperating with appointing authorities and screening committees seeking names for consideration, and by responding to official inquiries concerning a person being considered for a judgeship.

**Canon 2C.** Membership of a judge in an organization that practices invidious discrimination gives rise to

P. Supp. Appx. 22

perceptions that the judge impartiality is impaired. Canon 2C refers to the current practices of the organization Whether an organization practices invidious discrimination is often a complex question to which judges should be sensitive. The answer cannot be determined from a mere examination of an organization's current membership r but rather depends on how the organization selects members and other relevant factors, such as that the organiza is dedicated to the preservation of religious, ethnic or cultural values of legitimate common interest to its membe that it is in fact and effect an intimate, purely private organization whose membership limitations could not be constitutionally prohibited. See New York State Club Ass'n. Inc. v. City of New York, 487 U.S. 1, 108 S. Ct. 222 101 L. Ed. 2d 1 (1988); Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537, 107 S 1940, 95 L. Ed. 2d 474 (1987); Roberts v. United States Jaycees, 468 U.S. 609, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984). Other relevant factors include the size and nature of the organization and the diversity of persons in the lo who might reasonably be considered potential members. Thus the mere absence of diverse membership does not b itself demonstrate a violation unless reasonable persons with knowledge of all the relevant circumstances would expect that the membership would be diverse in the absence of invidious discrimination. Absent such factors, an organization is generally said to discriminate invidiously if it arbitrarily excludes from membership on the basis of race, religion, sex, or national origin persons who would otherwise be admitted to membership.

Although Canon 2C relates only to membership in organizations that invidiously discriminate on the basis of race, sex, religion or national origin, a judge's membership in an organization that engages in any invidiously discriminatory membership practices prohibited by applicable law violates Canons 2 and 2A and gives the appearan of impropriety. In addition, it would be a violation of Canons 2 and 2A for a judge to arrange a meeting at a club tha the judge knows practices invidious discrimination on the basis of race, sex, religion, or national origin in its membership or other policies, or for the judge to use such a club regularly. Moreover, public manifestation by a judg of the judge's knowing approval of invidious discrimination on any basis gives the appearance of impropriety under Canon 2 and diminishes public confidence in the integrity and impartiality of the judiciary, in violation of Canon 2A

When a judge determines that an organization to which the judge belongs engages in invidious discrimination that would preclude membership under Canon 2C or under Canons 2 and 2A, the judge is permitted, in lieu of resigning, to make immediate and continuous efforts to have the organization discontinue its invidiously discriminatory practices. If the organization fails to discontinue its invidiously discriminatory practices as promptly a possible (and in all events within two years of the judge's first learning of the practices), the judge should resign immediately from the organization.

## CANON 3

### A JUDGE SHOULD PERFORM THE DUTIES
### OF THE OFFICE IMPARTIALLY AND DILIGENTLY

The judicial duties of a judge take precedence over all other activities. In performing the duties prescribed by law, the judge should adhere to the following standards:

A. Adjudicative Responsibilities.

(1) A judge should be faithful to and maintain professional competence in the law, and should not be swayed by partisan interests, public clamor, or fear of criticism.

(2) A judge should hear and decide matters assigned, unless disqualified, and should maintain order and decorum in all judicial proceedings.

# Respect the Constitution

## Opposing view:
## Supreme Court should correct its mistake in creating privacy right.

By Bruce Fein

The Supreme Court should repudiate its extra-constitutional right of privacy, not because privacy should be treasured less, but because faithfulness to the Constitution should be coveted more.

Neither "privacy" nor a generalized "right to be left alone" appears in the Constitution. The Constitution entrusts Congress and state legislatures with creating privacy rights either by law or constitutional amendment. They have done so in spades. And the process by which rights are recognized — by legislatures, not courts. — is more important than their substance. The history of liberty has been a history of procedural safeguards against one branch of government usurping the powers of another.

The Founders intended the Constitution's original meaning to dictate its interpretation. The amendment process, involving active citizen participation and consensus, was expected to cure shortcomings. Supreme Court encyclicals hoping to summon into being a more perfect society were not contemplated.

Few would want to live in a nation without the Bill of Rights or the post-Civil War amendments, all proposed by Congress and ratified by state legislatures. But that does not mean the Supreme Court should have short-circuited the process by tortured interpretations of the original Constitution. When the court begins to ape Humpty Dumpty and make words mean whatever it wants them to mean, the justices have placed themselves above the Constitution and assumed the role of patronizing Platonic guardians.

The constitutional right of privacy was born of that evil, and has been brandished to overturn laws regulating abortion, homosexual sodomy and obscenity in the home. Same-sex marriage, polygamy, recreational drug use and jihad are clamoring for equal right-of-privacy protection.

The court enlisted sophomoric words and preposterous inferences in creating that right 40 years ago, talking of "penumbras" and "emanations" from the constitutional text and engaging in vague musings about "the moral fact that a person belongs to himself," and "defin[ing] one's own concept of existence ... and of the mystery of human life."

Longevity did not shield the odious, 58-year-old "separate but equal" doctrine from being overruled in *Brown v. Board of Education*. Neither should it deter the court from correcting its right-of-privacy stumble.

*Bruce Fein was an associate deputy attorney general in the Reagan administration.*



Q-5

G-5

# Umpiring the Constitution

**Hot corner.** For decades, defenders of the status quo have railed against "activist judges." Before chief justice nominee John Roberts could get a word out at this week's confirmation hearings, senators were lecturing him about the need for judges to be umpires, not players.

Roberts quickly embraced the umpire comparison. But over the course of three days, he quietly but repeatedly made a second point: Judges have to field the cases that come before them.

► When the Supreme Court outlawed racial segregation a half-century ago, sparking much of the caterwauling about judges, it wasn't the instigator. The court was forced to rule because lower courts had interpreted the issues involved differently.

► When state court judges in Hawaii, Vermont and Massachusetts ruled that same-sex couples were being illegally discriminated against, they, too, were acting as referees. The cases were brought by couples who could cite equal-rights provisions in their state constitutions and were demanding they be enforced.

► When a federal district judge ruled Wednesday that Pledge of Allegiance ceremonies in three California school districts are unconstitutional, he was at pains to say in his ruling that he had no choice: The appeals court above him had established a standard on the issue that he was bound to follow.

"Activist judge" is a political pejorative that ignores the reality that umpires, whether on the field or on the bench, have to make a call on every pitch that comes at them.

If Roberts is confirmed as chief justice, as seems likely, he could do the nation a service by using his position to make that point clear — and sidelining those who undermine trust in the courts by suggesting otherwise.

**Camera shy?** Roberts was the star this week at the Senate Judiciary Committee's televised hearings. But, assuming he's confirmed, the next time Americans see him on TV in any official capacity may not be until Jan. 20, 2009, when he swears in the next president on Inauguration Day.

Unlike both chambers of Congress and courts in 47 states, the Supreme Court won't allow its proceedings to be broadcast. The worry is that cameras could encourage attorneys to grandstand for viewers and would violate the justices' privacy. "The day you see



**John Roberts**
USA TODAY



**David Souter**
AP



**Robert Byrd**
AP

a camera come into our courtroom, it's going to roll over my dead body," Justice David Souter told a congressional panel in 1996.

Roberts may not be as camera-shy. In response to a question about courtroom cameras, he was noncommittal but said he would seek the opinions of other justices. He hinted, though, that he might not oppose the move: "My new best friend, Sen. Thompson, assures me that television cameras are nothing to be afraid of."

Fred Thompson, a former Republican senator from Tennessee who helped Roberts prepare for his testimony, plays a prosecutor on NBC's *Law & Order*.

Deliberations need to remain private, but arguments about the most controversial issues of our time before the justices who will decide them shouldn't be limited to the first 400 spectators who line up outside the court building.

"Sunshine is the best disinfectant," the late justice Louis Brandeis said about how secrecy can erode liberty. It's long past time that the court applied the same reasoning to itself.

**Unconstitutional?** Sen. Robert Byrd, D-W.Va., isn't a member of the Judiciary Committee, but he's one of the Senate's leading experts on the Constitution. He carries a pocket copy with him and is appalled by many students' ignorance of the seminal document signed on Sept. 17, 1787.

So last year, Byrd put an amendment into a 3,000-page spending bill that requires all schools receiving federal funding to teach about the Constitution every Sept. 17.

Because Sept. 17 falls on a Saturday this year, many schools will obey the law today. Across the USA, educators will dress up as George Washington or Patrick Henry to lead patriotic skits and songs.

This might sound harmless, even beneficial, but not everyone is celebrating.

At Vanderbilt University Law School, professors will observe the day next week by debating whether Byrd's law is constitutional. Compelling speech, says Dean Edward Rubin, tramples on the First Amendment.

You don't have to be a constitutional lawyer to understand why Constitution Day sets a bad precedent. What's next? Congress ordering schools to teach "intelligent design" instead of evolution? Or the glories of West Virginia on Sen. Byrd's birthday?

There's something about the Constitution Day mandate that seems, well, un-American.



$Q-1$

P. Supp Apx. 25

# Is our government dying?

## Sure, the Republicans are in trouble, suffering from some of the same ailments that buried Democrats in 1994. The real danger, though, is when the illness undermines the American public's trust in government.

By Ross K. Baker

Republicans in the White House and Congress, who are facing a host of legal and ethical problems, resemble a patient suffering from multiple, but unrelated, ailments who might not be able to fight off one affliction, but is ultimately killed by the combined effects of all of them.

The somber diagnosis is based on:

► Scandal — the indictment of vice presidential aide "Scooter" Libby, for allegedly revealing the identity of a CIA officer...

▼ The "cloud" of suspicion that hangs over White House Deputy Chief of Staff Karl Rove in that outing of the ambassador's wife.

▼ The growing indictment in Texas of House Majority Leader Tom DeLay...

A congressional investigation into the activities of lobbyist Jack Abramoff...

and candidate for lieutenant governor of Georgia, and anti-tax activist Grover Norquist.

▼ E-mail revelations, at hearings of the Senate Indian Affairs Committee, that a former deputy secretary of the Interior Department might have asked for the preferential treatment for Abramoff's clients, Indian tribes with interests in gambling casinos...

▼ E-mail messages that have come to light revealing that Michael Brown, initially praised by President Bush for the federal Emergency Management Agency's response to Hurricane Katrina, was more concerned with his wardrobe than with relief effort in New Orleans.

► Political scandals and misgovernance, occurring in clusters and cast a pall of suspicion over the party in power. Sometimes, they are traceable to a single source...

by Libby and Rove to discredit former ambassador Wilson with then-FEMA director Brown's halting response to Hurricane Katrina, these revelations can cross-contaminate each other in the eyes of the public and acquire more sinister dimensions.

These problems, some related and others independent, have enabled Democrats to envision a "culture of corruption," a slogan that will certainly be a rallying cry for the congressional elections of 2006. But the Democrats have yet to come up with an agenda comparable to "Contract With

### Unrelated or not, multiple scandals and blunders of public officials come to resemble a pandemic.

America," which Republicans used to reclaim both houses of Congress in 1994, after 40 years of Democratic dominance.

Former president Bill Clinton, for whom the 1994 election was a major setback, can well appreciate the problems consuming Republicans today. He took office in a wake of the House bank scandals with public approval of the Democratic Congress at an unprecedented low of 17%, but Clinton quietly got into problems of his own with: Travelgate, the firing of some employees in the White House travel office to make way for Clinton loyalists.

No sooner was that fire quenched than the White House had to cope with the suicide of presidential aide Vincent Foster and the epidemic of conspiracy theories about his death.

And little less than a year from his inauguration, Clinton found himself needing to request a special prosecutor to look into his and the first lady's investments in the

Whitewater land transaction. To add to his troubles, an important ally, House Ways and Means Committee Chairman Dan Rostenkowski, was indicted and pleaded guilty to mail fraud.

Combined with missteps on gays in the military and a failed health care initiative, the election of 1994 was a debacle for Democrats.

Unrelated or not, multiple scandals and blunders of public officials come to resemble a pandemic. The percentage of Americans who regard President Bush as honest and trustworthy has fallen to 46%, according to the latest USA TODAY/CNN/Gallup Poll. This number alone is eloquent evidence of the toxicity of these scandals and investigations.

The most afflicted, however, is not the Bush administration and the congressional Republicans up for re-election in 2006. It is the faith of Americans in their government, and it encompasses the entire range of government activities from disaster relief to the war in Iraq.

The much-discussed bird flu will become truly dangerous only if it mutates in a way that allows it to spread easily from person to person. Then and only then might we be hit by a global pandemic.

The bird flu is an apt metaphor for what's going on in Washington today. The question is will the virus of scandal and corruption leave the capital and infect our populace beyond the Beltway, undermining our trust in government from coast to coast?

If might be too late for a vaccine to immunize the American population against this debilitating condition.

Ross K. Baker is a political science professor at Rutgers University. He also is a member of USA TODAY's board of contributors.